AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

FILED BY _5P_ D.C.

FEB 19 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 20-8081-DLB |
| YACIEL MARAGOTO and | ) | |
| JUAN CARLOS CRUZ PAZ, | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 2018 - February 18, 2020___ in the county of _____Palm Beach_____ in the ___Southern___ District of _____Florida_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. 841(a)(1) and 846 | Conspiracy to possess with intent to distribute 500 grams or more of cocaine |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_Complainant's signature_

Adam Ballew, S/A DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___2 - 19 - 2020___

_Judge's signature_

City and state: _____West Palm Beach, FL_____    Dave Lee Brannon, US Magistrate Judge
*Printed name and title*

## AFFIDAVIT FOR CRIMINAL COMPLAINT

Before me appeared Thomas Adam Ballew, who, being duly sworn, states as follows:

1.      My name is Thomas Adam Ballew and I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since March 2008. I have received specialized training in the investigation of the distribution of controlled substances, including those that include the distribution of cocaine and other controlled substances. In the course of my work, I have interviewed numerous cooperating drug dealers and confidential sources, have observed and conducted undercover operations and reviewed recordings of undercover meetings. I have been both directly and indirectly involved with investigations during which the interception of wire communications occurring over telephones being utilized to facilitate the distribution of controlled substances have occurred. I have also made arrests and assisted with arrests for controlled substance offenses. I am thereby familiar with the methods used by drug dealers to sell controlled substances.

2.      The information in this Affidavit is written for the limited purpose of obtaining a criminal complaint charging Yaciel MARAGOTO and Juan Carlos CRUZ PAZ with conspiracy to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Accordingly, it does not contain all I know about the case. The information herein is based on my own observations and participation in the investigation, discussions with other law enforcement officers including DEA agents and Palm Beach Sheriff's Office (PBSO) narcotics agents, a confidential source, a cooperating defendant, a review of audio/video recordings made by devices that were activated during the purchases of cocaine conducted during this investigation, as well as a review of the transcripts of wire communications intercepted during the Court authorized wire intercept of telephone number (561) XXX-0811. Additionally, unless otherwise noted, the below-described conversations between A.M. and Juan Carlos CRUZ PAZ

are based on preliminary transcriptions of intercepted wire communications which were conducted in Spanish and are subject to further revision.

3.      In early 2018, DEA and PBSO began investigating A.M., who was identified as a cocaine distributor operating in Palm Beach County, Southern District of Florida. On September 11, 2019, the Honorable Donald M. Middlebrooks, United States District Court, Southern District of Florida, authorized the interception of wire communications occurring over telephone number (561) XXX-0811 (hereinafter referred to as A.M.'s phone), known to be utilized by A.M. to facilitate the distribution of cocaine. Investigators began intercepting the wire communications occurring over A.M.'s phone on September 12, 2019, and the interceptions terminated on October 11, 2019. During this period, several phone calls were intercepted with one of A.M.'s co-conspirators, Juan Carlos CRUZ PAZ. The following are examples of these intercepted communications:

4.      On September 28, 2019, at approximately 8:48 a.m., A.M. received an incoming call from CRUZ PAZ's phone and he spoke with CRUZ PAZ. After exchanging greetings, A.M. stated, "Talk to me chief. What's up? Today is a go." CRUZ PAZ responded, "Bad, bad news brother, check this out. The old woman took everything brother." A.M. asked, "Who?" CRUZ PAZ responded, "I left last night with [unintelligible], that crazy bitch took my box. I had two, two, two heavy equipments in there. She took it. I had like seven little ones and I had some money in there. She took it all. Lucky for me I took one. I took three up there and I returned with one and now I'm calling her, brother. She took everything here, everything. Furniture and the whole world and she finished me, brother. She took sixty something thousand dollars from me, brother. What the fuck? That old woman finished me, brother, now I'm fucked. I'm fucked." A.M. asked, "Where did she go? Where she go?" CRUZ PAZ responded, "I don't know! I'm calling and she

doesn't want to say where she is. [Unintelligible] I have an equipment here, I have an equipment here that I brought it from there last night. What the fuck dude, no." A.M. stated, "Well, if you want, bring it here to me. I'm here." CRUZ PAZ began talking about how the "woman" finished him and he was going crazy, and he stated, "Look, come pick it up. I'm scared of she coming over here. I don't think she will show up here, brother, because, because she, she finished me. She took two animals, brother, two animals plus, plus, plus seven or eight small bags. [Unintelligible] plus some money I had here. Now I'm on the streets. On the street! What the fuck, bro? People had all the reason when they would tell me 'Hey, she's going to fuck you, she's going to fuck you.' I got here at two in the morning [unintelligible] and I got here, everything brother she took the furniture and the whole world. And when I went to the box, shs! She left, she left me a letter in there." A.M. asked CRUZ PAZ to hold on. Agents heard another phone ringing in the background and heard A.M. answer that phone. A.M. then returned to the conversation and asked, "Then, she took the furniture too?" CRUZ PAZ advised, "Yeah, no, the furniture were hers. I don't care. But you can believe she took two heavy equipments, two big chargers, plus the other stuff I had there. Plus a, no, no, no, no, now I'm fucked. Fucked! What kind of shit is that, my brother! Hey and last night when I left, I left around at one or so in the afternoon and damn! I had the urge to take everything out from there man. But look at that man, how the woman figured me out, brother." A.M. again asked CRUZ PAZ to hold on and appeared to answer another phone that was heard ringing in the background. CRUZ PAZ stated, "Hey, look," and A.M. responded, "Talk to me." CRUZ PAZ advised, "Come and pick this up. And I'll pick that up later because I'm scared to leave here." A.M. replied, ". . . listen to what I'm going to tell you," and CRUZ PAZ stated, "Tell me." A.M. advised, "Listen to me, I [stutters] the one who is scared is me. I'm going to tell you why, because you don't know what else that fucking crazy lady can do." A.M. began

to explain to CRUZ PAZ that the "woman" was capable of doing anything and CRUZ PAZ reiterated that she had finished CRUZ PAZ. A.M. then stated, "No, but the problem, look, listen, the problem is not that she finished you. You have to use your, you have to use your head now." CRUZ PAZ responded, "No, no, now I'm crazy." A.M. advised, "That's why I'm going to tell you because she could send you to die with those people. Remember." CRUZ PAZ asked, "Huh?" A.M. stated, "She can kill you again with those people to avoid giving back your stuff." CRUZ PAZ responded, "No, no. I don't think so. She won't give back shit. I have been calling to everyone. I have talked twice to her [unintelligible]. I don't know where she is at . . . ." CRUZ PAZ again lamented about how CRUZ PAZ was in trouble. A.M. stated, "I'm going to tell you something. The best thing you can do is call your associate that has your same name and have him come and pick up what's left behind, just in case. Because she's, she is capable of calling those people, and it goes . . . ." CRUZ PAZ and A.M.'s voices overlapped and CRUZ PAZ stated, "Yeah, I have here, I have here [unintelligible] big boxes. Do you want me to bring them to you?" A.M. responded, "Well, if you want, bring them. Yeah." CRUZ PAZ stated, "I'm going to leave them with you but, alright I'll bring them there." A.M. responded, "I'm not going there, what I don't want to do is go there [laughs] in those conditions. Are you crazy?" CRUZ PAZ then advised, "No, no, no I'll bring it to you. I'll bring it to you. Bye." A.M. said "Bye," and the call ended.

5.     Based on my training, experience, and knowledge of this investigation, I believe that this call was related to CRUZ PAZ's girlfriend stealing two (2) kilograms and seven or eight ounces of cocaine, along with some money, from CRUZ PAZ. I believe that A.M. initially informed CRUZ PAZ that he (A.M.) was ready to meet with CRUZ PAZ as initially discussed, but CRUZ PAZ informed A.M. that CRUZ PAZ had bad news and explained that CRUZ PAZ's

girlfriend had taken all of the cocaine ("the old woman took everything"). I believe that CRUZ PAZ stated that CRUZ PAZ had left the previous night and that CRUZ PAZ's girlfriend had taken CRUZ PAZ's safe ("my box") that contained two (2) kilograms of cocaine ("two heavy equipments") in addition to seven ounces of cocaine and an unknown amount of money ("seven little ones and some money"). I believe that CRUZ PAZ further informed A.M. that it was fortunate that the previous day CRUZ PAZ had taken three (3) kilograms of cocaine to an unknown location where CRUZ PAZ distributed two (2) of the three kilograms and returned with one (1) ("Lucky for me I took one. I took three up there and I returned with one . . ."). I believe that CRUZ PAZ reported that CRUZ PAZ had been calling CRUZ PAZ's girlfriend and reiterated that the girlfriend had taken everything, including furniture. I believe that CRUZ PAZ reported that the value of the stolen cocaine was in excess of $60,000.00 ("She took sixty something thousand dollars from me, brother"), which I believe confirms that CRUZ PAZ was specifically discussing cocaine as opposed to any other type of drug.[1] I believe that CRUZ PAZ had contact with the girlfriend but did not know her current location. I also believe that CRUZ PAZ informed A.M. that CRUZ PAZ currently had a kilogram of cocaine in CRUZ PAZ's possession ("I have an equipment here, I have an equipment here that I brought it from there last night"), which is consistent with CRUZ PAZ's earlier statement about taking three up the previous day and bringing one back. I further believe that A.M. offered to take possession of the kilogram of cocaine from CRUZ PAZ and asked CRUZ PAZ to deliver the kilogram to him ("Well, if you want, bring it

---

[1] Based on the latest reported average street price of a kilogram of cocaine in the West Palm Beach area to be between $25,000.00 and $32,000.00, and the average price of an ounce of cocaine in the same area to be between $800.00 and $1300.00, I believe CRUZ PAZ specifically discussed cocaine when he stated that the value of the stolen cocaine (two kilograms and seven ounces) plus the stolen money was in excess of $60,000.00.

here to me. I'm here.").[2]  I believe that CRUZ PAZ again confirmed that the girlfriend had taken

two kilograms of cocaine in addition to seven or eight ounces of cocaine and some money ("She

took two animals, brother, two animals plus, plus, plus seven or eight small bags. [Unintelligible]

plus some money I had here").  I believe that CRUZ PAZ stated that when CRUZ PAZ returned

to the location CRUZ PAZ was using to store the cocaine, CRUZ PAZ noticed that furniture was

missing.  This caused CRUZ PAZ to check the safe in which the cocaine was kept, which resulted

in CRUZ PAZ finding a letter that the girlfriend had left (". . . I got here, everything brother she

took the furniture and the whole world.  And when I went to the box, shs!  She left, she left me a

letter in there").  I also believe that when CRUZ PAZ discussed missing furniture, this was not

coded language being used as a reference to an illegal item, but rather an explanation that the

girlfriend had also taken furniture that belonged to her.  I believe that CRUZ PAZ was not worried

about the furniture, but was distressed about the stolen cocaine (". . . the furniture were hers.  I

don't care.  But you can believe she took two heavy equipments, two big chargers, plus the other

stuff I had there.  Plus a, no, no, no, no now I'm fucked.  Fucked!").  I believe that CRUZ PAZ

asked A.M. to pick up the kilogram of cocaine from CRUZ PAZ and in turn, CRUZ PAZ would

pick up the money from A.M. later because CRUZ PAZ was scared to leave ("Come and pick this

up.  And I'll pick that up later because I'm scared to leave here").  I believe that A.M. then informed

CRUZ PAZ that he (A.M.) was also scared because CRUZ PAZ's girlfriend was unpredictable (".

. . you don't know what else that fucking crazy lady can do").  I believe that A.M. cautioned CRUZ

PAZ to be smart (". . . you have to use your head now") and warned CRUZ PAZ that the girlfriend

could attempt to avoid returning the cocaine by getting CRUZ PAZ into legal trouble by notifying

---

[2] The GPS location data pertaining to A.M.'s phone indicated that at approximately 8:57 a.m.
A.M.'s phone was in the area of 2464 Palm Road, West Palm Beach, Florida, which is known to
be A.M.'s home address (with a certainty factor of 11 meters).

law enforcement of CRUZ PAZ's cocaine distribution, which could result in a long prison sentence for CRUZ PAZ (". . . she could send you to die with those people" and "She can kill you again with those people to avoid giving back your stuff").[3] CRUZ PAZ responded that CRUZ PAZ did not believe that the girlfriend would do that, but agreed that she would not give the cocaine back. CRUZ PAZ indicated that CRUZ PAZ had spoken to the girlfriend twice and reiterated that CRUZ PAZ did not know her current location. I believe that A.M. advised CRUZ PAZ to call a third party with the same name as CRUZ PAZ to have that person pick up the cocaine in the event that CRUZ PAZ's girlfriend called the police ("The best thing you can do is call your associate that has your same name and have him come and pick up what's left behind, just in case. Because she's, she is capable of calling those people . . ."). I believe CRUZ PAZ asked if A.M. wanted CRUZ PAZ to bring the kilogram of cocaine to A.M. ("Do you want me to bring them to you?") to which A.M. agreed ("Well, if you want, bring them. Yeah"). I believe that CRUZ PAZ offered to transport the kilogram of cocaine to a location known to both CRUZ PAZ and A.M. where A.M. could pick it up ("I'm going to leave them with you but, alright I'll bring them there"). I believe that A.M. informed CRUZ PAZ that, given the current circumstances, he (A.M.) was not going to the location to pick up the cocaine ("I'm not going there, what I don't want to do is go there [laughs] in those conditions. Are you crazy?"). I believe that CRUZ PAZ then clarified that CRUZ PAZ would bring the kilogram of cocaine directly to A.M. ("No, no, no I'll bring it to you. I'll bring it to you").

6.     On September 28, 2019, at approximately 9:26 a.m., law enforcement was able to establish visual surveillance at a residence frequented by CRUZ PAZ (hereinafter referred to as

---

[3] As previously mentioned, CRUZ PAZ has two prior federal convictions for narcotics related offenses. I believe that A.M. pointed out that a third arrest for cocaine related charges would result in a lengthy federal prison sentence for CRUZ PAZ.

CRUZ PAZ address #1). Approximately 15 minutes later, law enforcement was able to establish simultaneous visual surveillance at A.M.'s residence.[4]

7.      On September 28, 2019, at approximately 9:45 a.m., a law enforcement officer conducting surveillance at A.M.'s residence observed a vehicle matching the description of a vehicle registered to CRUZ PAZ (hereinafter referred to as CRUZ PAZ vehicle #1) back out of A.M.'s driveway and noted that it was being driven by an individual wearing a white T-shirt. Due to uncertainty regarding CRUZ PAZ's pending delivery of the kilogram of cocaine, law enforcement maintained their surveillance positions and did not follow the vehicle as it departed from the area.

8.      On September 28, 2019, at approximately 10:50 a.m., law enforcement conducting surveillance at CRUZ PAZ address #1 observed the aforementioned vehicle arrive at the residence and noted that the individual wearing the white T-shirt exited the driver's seat carrying a bag. At this point, the individual was positively identified as CRUZ PAZ and it was confirmed that the vehicle matched CRUZ PAZ vehicle #1).[5] CRUZ PAZ was observed entering the residence where CRUZ PAZ stayed for a short time before returning to and re-entering CRUZ PAZ vehicle #1 and departing the residence. Law enforcement initiated mobile surveillance of CRUZ PAZ and followed CRUZ PAZ to a complex in Palm Beach County, Florida. Law enforcement entered the complex a short time after CRUZ PAZ and located CRUZ PAZ vehicle #1 parked, unoccupied, in the lot. Law enforcement then established surveillance in the lot.

---

[4] At approximately 9:44 a.m., the GPS location data pertaining to A.M.'s phone indicated that A.M.'s phone was in the area of A.M.'s residence (with a Certainty Factor of 14 meters).
[5] The law enforcement officer who observed CRUZ PAZ vehicle #1 arrive identified CRUZ PAZ from CRUZ PAZ's DAVID system photograph. Additionally, a check of the DAVID system revealed that the license plate is registered to a vehicle that is registered to CRUZ PAZ with a listed address of CRUZ PAZ address #1.

9.      On September 28, 2019, at approximately 11:40 a.m., law enforcement observed CRUZ PAZ exit a specific unit in the complex (CRUZ PAZ address #2) and stand outside briefly as if CRUZ PAZ was waiting for someone. CRUZ PAZ then re-entered the unit and, a short time later, a gray Chrysler 300 with dark tinted windows arrived in the lot and parked. Law enforcement observed a Hispanic male wearing a red shirt and a light colored hat (later positively identified as F.P.) exit the Chrysler 300 and walk to and enter CRUZ PAZ address #2. A short time later, law enforcement observed CRUZ PAZ and F.P. exit the apartment, enter the Chrysler 300, and exit the parking lot. Surveillance units followed the Chrysler 300 as it drove to the Enterprise Rent-A-Car located at 7750 Okeechobee Boulevard, West Palm Beach, Florida. While at Enterprise, law enforcement observed a Hispanic female wearing yoga pants and a black shirt (later identified as S.D.) join CRUZ PAZ and F.P. as they met with an employee and completed paperwork. Ultimately, CRUZ PAZ and F.P. entered a black Ford Explorer and departed from Enterprise. Law enforcement initiated mobile surveillance of the Explorer and followed CRUZ PAZ and F.P. as F.P. drove the Explorer to the Latin American Grill, 15342 NW 79th Court, Hialeah, Florida, where they arrived at approximately 1:15 p.m. Law enforcement observed CRUZ PAZ and F.P. exit the Explorer and walk towards the restaurant. A short time later, CRUZ PAZ walked alone back to the Explorer and quickly exited the parking lot. At this point, law enforcement was unable to conduct mobile surveillance of CRUZ PAZ and surveillance was terminated.

10.     On September 28, 2019, at approximately 9:48 p.m., A.M. received an incoming call from CRUZ PAZ's number and spoke with CRUZ PAZ. After exchanging greetings, CRUZ PAZ stated, "Hey I went, I went down there to Miami, and I solved it." A.M. asked, "What?" CRUZ PAZ stated, "Uh, I went to Miami and I solved it, I solved it." CRUZ PAZ added, "You

know, I went to talk to the neighbors. A U-Haul truck came and picked up all the things. I believe she is at her son's house in Port Saint Lucie . . . I talked to her daughters and they told me they will talk to her and I told them 'Tell her that she can keep all the other things but that stuff, but that [stutters] she must return it to me' . . . ." CRUZ PAZ began complaining about the situation and A.M. interrupted and stated, "I'll, I'll call you back, dude [stutters] I'll call you back. CRUZ PAZ agreed and the call ended.

11.     Based on my training, experience, and knowledge of this investigation, I believe that CRUZ PAZ informed A.M. that CRUZ PAZ had gone to Miami to meet with CRUZ PAZ's cocaine source of supply to discuss the aforementioned cocaine theft (". . . I went down there to Miami, and I solved it"). Based on the fact that law enforcement observed CRUZ PAZ and F.P. travel to the area of Hialeah, Florida in a rented vehicle earlier in the day, I believe the purpose of this trip was for CRUZ PAZ to meet with CRUZ PAZ's cocaine source of supply. I further believe that CRUZ PAZ stated that CRUZ PAZ had been in contact with the girlfriend's daughters and had instructed them to tell the girlfriend that she could keep everything except the cocaine which she needed to return to CRUZ PAZ ("I told them 'Tell her that she can keep all the other things but that stuff, but that [stutters] she must return it to me' . . .").

12.     On September 28, 2019, at approximately 9:53 p.m., A.M. placed an outgoing call to CRUZ PAZ's number and spoke with CRUZ PAZ. CRUZ PAZ told A.M., "These people down there are really pissed off. I went down there and I solved but, shit. These people want to brush her up. Do you get me?" A.M. acknowledged and CRUZ PAZ stated, "Then, she left me a letter over there, a nasty letter . . . I wish you could see all what she tells me on that letter, like in case I do something. Do you get me?" CRUZ PAZ complained about the situation and A.M. asked, "And she does not answer the phone nor anything, right?" CRUZ PAZ advised, "No, she turned

it off . . . I spoke with her like two or three times . . ." and indicated that CRUZ PAZ told her, "Please, give me back the [unintelligible]. You can keep the other thing but that, give me back that, please. Please, otherwise there will be an awful problem . . . ." CRUZ PAZ continued to speak about the situation and later added ". . . And she even left me a letter inside the box, dude. When I opened the box, she even had the box key . . . ." CRUZ PAZ informed A.M., "Shit, brother! No, no, no, fuck! [Stutters] I have to pay these people and that's it! There is no other way! She really fucked me up, man! She waited for the right opportunity!" A.M. advised, "She has, she has been watching you." CRUZ PAZ responded, "Oh, no. She really fucked me up and, with a good amount! Not a piece of shit, you know." A.M. agreed and CRUZ PAZ stated, "If it were a small amount, I would care a shit. But no, she got me! She got me with two big bricks. Plus the money that she took and, some other crap that she also took away." CRUZ PAZ later stated, "They have that stuff over there. They have not gotten rid of that. Whom would they give it to? Those people deal just with little stuff. I don't know. Unless she call somebody and give it to him. You know? But this won't end up just here . . . And these people from down there want to, come up here. I told them 'No, no' because, do you get me? All the shit would fall over me, brother." A.M. agreed and CRUZ PAZ advised, "I already called her several times from the other phone of mine, uh, you know, and…." A.M. interrupted and asked, "And, listen, and, and what does she say on the letter?" CRUZ PAZ stated, "What? The letter? I have it saved . . . she says that she knows everything what I do for a living, all what I deal with, uh, everything, everything . . . ." CRUZ PAZ later added, ". . . But I blame myself, brother. I blame myself for having left that stuff over there, knowing all the things she already did to me in the past. Knowing that she already stole money from me, that she stole the other, I don't know dude, how I, I'm too naïve. Too naïve. I'm a damn stupid . . . . Shit!" CRUZ PAZ also repeated what CRUZ PAZ said to the

girlfriend's daughters, "I told them: 'Listen, tell her that I forgive her, and that, to give back that stuff and they could keep the other, that I don't care about it. But not the other stuff.' Do you get me? Because the other stuff is [scoffs] sixty grands that I have to give back, brother. Did you hear?" A.M. stated, "Dammit," and CRUZ PAZ reiterated, "For you to know. Sixty grands." After some additional conversation, A.M. and CRUZ PAZ agreed to talk later and the call ended.

13.     Based on my training, experience, and knowledge of this investigation, I believe CRUZ PAZ reiterated that CRUZ PAZ had spoken to the girlfriend's daughters and instructed them to tell the girlfriend that CRUZ PAZ forgave her and that she could keep the money and furniture but she had to return the two kilograms of cocaine ("those horses") to CRUZ PAZ. I also believe that CRUZ PAZ stated that the cocaine source of supply, to whom CRUZ PAZ had spoken regarding the girlfriend's theft of the cocaine, was upset about the situation and indicated that they wanted to cause physical harm to CRUZ PAZ's girlfriend ("These people down there are really pissed off. I went down there and I solved but, shit. These people want to brush her up"). I believe that CRUZ PAZ also indicated that CRUZ PAZ had been able to speak with the girlfriend two to three times and had asked her to return the cocaine to avoid trouble (". . . give me back that, please. Please, otherwise there will be an awful problem . . ."). I believe that CRUZ PAZ attempted to convey to the girlfriend that the cocaine source of supply was unhappy with the girlfriend and wanted to harm her for stealing the cocaine. I believe that CRUZ PAZ informed A.M. that the girlfriend had a key to the safe/container in which the cocaine was stored because she placed the letter she left for CRUZ PAZ inside this safe/container (". . . And she even left me a letter inside the box, dude. When I opened the box, she even had the box key . . ."). I believe this demonstrates that CRUZ PAZ's girlfriend knew what was inside the safe/container and had ready access to the safe/container by virtue of having a key. I believe that CRUZ PAZ's statement ". . . I have to pay

these people and that's it! There is no other way!" indicated that the cocaine source of supply had "fronted" CRUZ PAZ the cocaine, or provided it in advance of receiving payment, and that CRUZ PAZ was indebted to the source of supply the value of the cocaine. I believe that CRUZ PAZ again explained to A.M. that CRUZ PAZ's girlfriend had taken two kilograms of cocaine when CRUZ PAZ stated "If it were a small amount, I would care a shit. But no, she got me! She got me with two big bricks. Plus the money that she took and, some other crap that she also took away." I believe that CRUZ PAZ thought that the girlfriend was still in possession of the cocaine because she and/or her family members and associates would not have a customer for kilogram quantities of cocaine due to the fact that they only distribute small amounts ("They have that stuff over there. They have not gotten rid of that. Whom would they give it to? Those people deal just with little stuff. I don't know. Unless she call somebody and give it to him . . ."). I believe that CRUZ PAZ again repeated that the cocaine source of supply was unhappy that the girlfriend had stolen the cocaine and wanted to travel from their location to deal with the situation, which CRUZ PAZ did not want to happen for fear that CRUZ PAZ would be blamed for whatever happened (". . . And these people from down there want to, come up here. I told them 'No, no' because, do you get me? All the shit would fall over me, brother"). I believe that CRUZ PAZ's statement that the girlfriend wrote ". . . she says that she knows everything what I do for a living, all what I deal with, uh, everything, everything . . ." confirmed that the girlfriend was aware that CRUZ PAZ was distributing kilogram amounts of cocaine and then made a deliberate choice to steal the remaining cocaine from the safe/locked container when CRUZ PAZ was away. I also believe that CRUZ PAZ took personal responsibility for the theft of the cocaine (". . . But I blame myself, brother. I blame myself for having left that stuff over there, knowing all the things she already did to me in the past. Knowing that she already stole money from me, that she stole the other . . ."). I further

believe that CRUZ PAZ once again confirmed that the amount of cocaine stolen by the girlfriend was two kilograms when CRUZ PAZ described to A.M. that CRUZ PAZ owed the source of supply $60,000.00 (". . . the other stuff is [scoffs] sixty grands that I have to give back, brother").[6]

14.     On November 22, 2019, United States Magistrate Bruce E. Reinhart, Southern District of Florida, authorized a tracking warrant for a second vehicle known to be utilized by CRUZ PAZ (hereinafter referred to as CRUZ PAZ vehicle #2).

15.     On November 26, 2019, at approximately 3:50 a.m., law enforcement installed a covert tracking device on CRUZ PAZ vehicle #2 as it was parked in the parking lot in the vicinity of CRUZ PAZ address #2. At this time, electronic tracking of CRUZ PAZ vehicle #2 was initiated.

16.     On December 10, 2019, at approximately 7:50 p.m., the tracking device installed on CRUZ PAZ vehicle #2 reported its location to be 14360 NW 77th Court, Hialeah, Florida, where it was stationary for approximately 15 minutes. The tracking device on CRUZ PAZ vehicle #2 then reported a new location of 8360 Dundee Terrace, Miami Lakes, Florida, where it was stationary for approximately 13 minutes.[7]

17.     On December 11, 2019, at approximately 4:05 a.m., law enforcement located CRUZ PAZ vehicle #2 in the parking lot and replaced the covert tracking device installed on CRUZ PAZ vehicle #2 with another covert tracking device.

18.     On December 30, 2019, at approximately 11:53 a.m., the tracking device on CRUZ PAZ vehicle #2 reported its location to be 8336 Dundee Terrace, Miami Lakes, Florida, where it

---

[6] I believe this statement indicated that the cocaine source of supply charged CRUZ PAZ $30,000.00 per kilogram of cocaine, which is within the previously mentioned average price range for a kilogram of cocaine in the West Palm Beach, Florida, area.

[7] These locations are within an approximate one mile drive from the location where law enforcement lost visual of CRUZ PAZ on September 28, 2019, as previously discussed in Paragraphs 10 and 11. As previously discussed, law enforcement believes that CRUZ PAZ's trip on September 28, 2019, was for the purpose of discussing the cocaine theft with the cocaine source of supply. Law enforcement further believes that CRUZ PAZ may have traveled back to this area on December 10, 2019, to either acquire additional cocaine for redistribution and/or to make a payment to the cocaine source of supply as reimbursement for the aforementioned cocaine theft.

remained for approximately 31 minutes. The tracking device on CRUZ PAZ vehicle #2 then reported a new location of 15346 NW 79th Court, Hialeah, Florida, where it remained for approximately 14 minutes. Approximately one hour later, the tracking device on CRUZ PAZ vehicle #2 reported in the Palm Beach County, Florida, area.

19.     On January 6, 2020, law enforcement located CRUZ PAZ vehicle #2 in the parking lot near CRUZ PAZ address #2 and removed the tracking device pursuant to the provisions of the Tracking Warrant.

20.     On February 11, 2020, Judge Reinhart authorized another tracking warrant for CRUZ PAZ vehicle #2.

21.     On February 13, 2020, at approximately 3:10 a.m., law enforcement installed a covert tracking device on CRUZ PAZ vehicle #2 as it was parked in the parking lot in the vicinity of CRUZ PAZ address #2. At this time, electronic tracking of CRUZ PAZ vehicle #2 was initiated.

22.     On February 14, 2020, at approximately 8:20 a.m., the tracking device reported its location to be 3696 S. Congress Avenue, Palm Springs, Florida. A short time later, law enforcement located CRUZ PAZ vehicle #2 parked in a lot of a medical center located at 3460 S. Congress Avenue, Palm Springs, Florida, and later observed CRUZ PAZ walking between CRUZ PAZ vehicle #2 and the business. At approximately 10:00 a.m., law enforcement established mobile surveillance of CRUZ PAZ as CRUZ PAZ departed in CRUZ PAZ vehicle #2.

23.     On this date at approximately 11:20 a.m., law enforcement observed CRUZ PAZ park CRUZ PAZ vehicle #2 in a common area between 8336 and 8360 Dundee Terrace, Miami Lakes, Florida. Law enforcement observed that CRUZ PAZ exited from the vehicle empty handed and walk toward 8356 Dundee Terrace, Miami Lakes. Approximately 32 minutes later, law enforcement observed CRUZ PAZ and a Hispanic male wearing a white button down shirt (later

identified by law enforcement and CRUZ PAZ as Yaciel MARAGOTO) emerge from 8356 Dundee Terrace and stand at the rear of a brown Nissan Titan that was backed in near the door to the residence. After a short time, CRUZ PAZ and MARAGOTO re-entered 8356 Dundee Terrace and CRUZ PAZ then exited and was observed to be carrying a white, envelope shaped package under one arm and a bag in CRUZ PAZ's hands. CRUZ PAZ then entered CRUZ PAZ vehicle #2 and was followed by law enforcement as CRUZ PAZ drove away. Law enforcement maintained constant visual surveillance of CRUZ PAZ as CRUZ PAZ ultimately drove north on Interstate 95 and entered Palm Beach County, Florida.

24.    At approximately 12:55 p.m., a marked Palm Beach Sheriff's Office vehicle initiated a traffic stop of CRUZ PAZ's vehicle after observing CRUZ PAZ change lanes on Interstate 95 without signaling. After making contact with CRUZ PAZ, CRUZ PAZ provided consent to search CRUZ PAZ vehicle #2. Upon doing so, law enforcement located a white envelope that contained two clear plastic bags that each contained a chunky white substance suspected to be cocaine.[8] At this point, CRUZ PAZ was detained and was relocated to a nearby area off of Interstate 95 where CRUZ PAZ was advised of the *Miranda* warnings. Post-*Miranda*, CRUZ PAZ initially stated that CRUZ PAZ had no knowledge of cocaine being inside CRUZ PAZ vehicle #2. Law enforcement informed CRUZ PAZ that, given CRUZ PAZ's criminal history involving controlled substances, CRUZ PAZ's story was not believable. CRUZ PAZ was then advised that if CRUZ PAZ wanted to cooperate with the investigation in an effort to help CRUZ PAZ and possibly receive future judicial consideration, law enforcement could spend additional

---

[8] Law enforcement later conducted a field test of the chunky white substance, which produced positive results for the presence of cocaine. Law enforcement also determine that the total package weight of the suspected cocaine (including the evidence bag) was approximately 72 grams.

time speaking with CRUZ PAZ. CRUZ PAZ agreed and was then transported to the Palm Beach County Sheriff's Office for an interview.

25.     During the subsequent interview, CRUZ PAZ advised that CRUZ PAZ had acquired the suspected cocaine that was seized from CRUZ PAZ vehicle #2 (which CRUZ PAZ later reported weighed approximately two ounces) from "Yaciel." CRUZ PAZ further stated that CRUZ PAZ had gone to "Yaciel's" residence and watched "Yaciel" separate the two ounces from a larger amount of cocaine that CRUZ PAZ estimated was approximately one kilogram of cocaine. CRUZ PAZ advised that CRUZ PAZ had observed an additional amount of suspected cocaine inside boxes within "Yaciel's" residence and estimated that it was either seven or eight kilograms of suspected cocaine. CRUZ PAZ advised that CRUZ PAZ had been acquiring kilogram and fractional kilogram amounts of cocaine from "Yaciel" for more than one year and estimated that CRUZ PAZ had acquired approximately 15 to 20 kilograms of cocaine from "Yaciel" during that period. CRUZ PAZ stated that in the past, "Yaciel" had delivered cocaine to CRUZ PAZ in Palm Beach County. CRUZ PAZ was then shown a Florida DAVID system photograph of Yaciel MARAGOTO and CRUZ PAZ positively identified the photograph as being "Yaciel."[9] CRUZ PAZ, who had been in possession of two telephones at the time of the traffic stop, advised that CRUZ PAZ had MARAGOTO's phone number stored in one of the phones under the label "Yaciel." CRUZ PAZ then allowed law enforcement to look in the "flip" phone and law enforcement identified telephone number (561) XXX-4498 stored as "Yaciel."[10] CRUZ PAZ

[9] The Florida DAVID system lists MARAGOTO's address as 8356 Dundee Terrace, Miami Lakes, Florida 33016. This is the same address where CRUZ PAZ was observed walking toward while empty handed and later walking away while carrying a white envelope shaped object and bag. Additionally, law enforcement identified MARAGOTO as being the individual who exited from 8356 Dundee Terrace, Miami Lakes, with the CRUZ PAZ and standing outside the residence with CRUZ PAZ near a Nissan Titan truck.

[10] A review of the telephone toll records previously obtained for CRUZ PAZ's phone revealed that CRUZ PAZ's phone had been in contact with telephone number (561) XXX-4498 contemporaneous to CRUZ PAZ traveling to the area of 8356 Dundee Terrace, Miami Lakes on September 28, 2019, December 10, 2019, and December 30, 2019.

advised that CRUZ PAZ did not remember the number to "flip" phone and advised that law enforcement could call another phone to determine what number displayed. Upon doing this, law enforcement was able to confirm that the "flip" phone was the number intercepted during the course of the interception of A.M.'s wire communications. Additionally, CRUZ PAZ reported that CRUZ PAZ still owed MARAGOTO in excess of $50,000.00 for cocaine that CRUZ PAZ had previously obtained from MARAGOTO and indicated that CRUZ PAZ was able to repay MARAGOTO by continuing to redistribute the cocaine supplied by MARAGOTO and providing MARAGOTO with the profit that CRUZ PAZ would have made on the distribution of the cocaine. For this reason, CRUZ PAZ believed that MARAGOTO would not distribute the cocaine CRUZ PAZ observed inside MARAGOTO's residence to anyone else without first checking with CRUZ PAZ to determine if CRUZ PAZ had a buyer for the cocaine.

26.     CRUZ PAZ was later shown a video that law enforcement had taken during a "drive by" of 8356 Dundee Terrace, Miami Lakes, Florida, and CRUZ PAZ identified the video as depicting MARAGOTO's residence.

27.     On February 17, 2020, law enforcement made contact with CRUZ PAZ and CRUZ PAZ reported that CRUZ PAZ had not had contact with MARAGOTO since February 14, 2020.

28.     On February 18, 2020, at approximately 12:00 p.m., CRUZ PAZ received an incoming call from MARAGOTO's phone (after previously placing two outgoing calls to MARAGOTO that were unanswered). During this call, which was monitored and recorded by law enforcement, CRUZ PAZ advised MARAGOTO that CRUZ PAZ ". . . had three jobs and a pair of halves . . ." (coded conversation referring to CRUZ PAZ wanting three kilograms of cocaine and two half-kilograms of cocaine, for a total of four kilograms of cocaine). CRUZ PAZ asked MARAGOTO when he (MARAGOTO) could arrive (coded conversation asking how soon

MARAGOTO could arrive in Palm Beach County with the cocaine).  MARAGOTO indicated that he (MARAGOTO) could be there at 7:00 p.m. but CRUZ PAZ requested that it be earlier because CRUZ PAZ's "people" (coded conversation for cocaine customers) were not going to wait.  CRUZ PAZ then asked MARAGOTO if he (MARAGOTO) was ". . . good with the work" (coded conversation for still possessing cocaine) and MARAGOTO affirmed.  The call subsequently ended.

29.     On February 18, 2020, at approximately 12:16 p.m., law enforcement officers established surveillance at 8356 Dundee Terrace, Miami Lakes, Florida.  At approximately 1:23 p.m., CRUZ PAZ received an incoming call from telephone number (561) XXX-4498 and spoke with MARAGOTO.  During this call, which was monitored and recorded, MARAGOTO indicated the he (MARAGOTO) would be leaving at approximately 2:00 p.m. to come meet with CRUZ PAZ.

30.     At approximately 2:30 p.m., law enforcement officers conducting surveillance at 8356 Dundee Terrace, Miami Lakes, Florida observed MARAGOTO exit the residence and noted that he was carrying a black backpack, which he was carrying on the front of his body.  MARAGOTO walked to and entered a larger Lexus SUV displaying Florida license plate KGRX31, and then departed the residence.  Agents followed MARAGOTO as MARAGOTO drove in an erratic manner consistent with a "heat run".  Law enforcement ultimately followed MARAGOTO back to the Dundee Terrace residence where agents observed him exiting the larger Lexus without the backpack and entering the residence.

31.     At approximately 3:23 p.m., a brown Nissan Titan (later determined to display Florida license plate LXGX83) arrived and parked next to the aforementioned Lexus.  Law enforcement observed the driver of the Nissan, later identified as Y.G., exit the Nissan and move

quickly to the passenger side of the larger Lexus where he opened the larger Lexus door and the rear passenger side door of the Nissan. Law enforcement advised that Y.G. reached into the Lexus and removed an item, which he then transferred to the rear passenger side of the Nissan. Y.G. then closed both vehicle doors and quickly returned to the driver's seat and departed the residence. Law enforcement noted that, as this was happening, MARAGOTO had exited the residence and stood near the front door approximately ten feet from where Y.G. was moving around between the vehicles. When Y.G. departed, MARAGOTO reentered the residence. Law enforcement followed Y.G. and maintained constant visual surveillance of him as he ultimately traveled north on the Florida Turnpike.

32.    At approximately 3:30 p.m., S.L. (identified as the mother of MARAGOTO's child) arrived at the residence in a different smaller Lexus SUV displaying Florida license plate CLRX71. S.L. backed this smaller Lexus in a parking space near the front door and entered the residence. At approximately 3:45 p.m., law enforcement conducted a traffic stop of the Nissan Titan driven by Y.G. on the Florida Turnpike near Commercial Boulevard. Y.G. provided consent to search the Nissan and a law enforcement K9 was deployed to conduct a "sniff" around the vehicle. The K9 alerted to the presence of an odor of a controlled substance emanating from the vehicle and a search of the passenger compartment resulted in the recovery of a black backpack from the rear passenger side that contained approximately four (4) kilograms of suspected cocaine.

33.    Between approximately 4:15 p.m. and 4:45 p.m., law enforcement observed an increased amount of foot traffic in the area of 8356 Dundee Terrace, including MARAGOTO and N.E. (later identified as MARAGOTO's mother) exiting from the residence and walking through the parking area while appearing to look up and down the street as if they were trying to locate someone. Law enforcement also observed an unidentified Hispanic male make approximately

three trips from the residence to the area where the smaller Lexus bearing Florida license plate CLRX71 was parked. During this period, MARAGOTO entered the larger Lexus displaying Florida license plate KGRZ31 and departed. A short time later, law enforcement conducted a traffic stop of this larger Lexus and detained MARAGOTO.

34.     At approximately 4:55 p.m., law enforcement executed a federal search warrant at the residence and determined that S.L., N.E., and a male infant were the only individuals inside. Prior to conducting a physical search of the residence pursuant to a federal search warrant, law enforcement requested that a K9 enter the residence and conduct a "sniff" inside the residence. Upon approaching the residence, the certified narcotics K9 alerted to the rear passenger door of the smaller Lexus displaying Florida license plate CLRX71 (previously observed being driven by S.L. and parked in the area with the unidentified male was previously observed walking multiple times). A search of the smaller Lexus revealed a cardboard baby wipe box in the floorboard of the rear passenger side and law enforcement observed what appeared to be kilogram-sized packages of suspected cocaine inside the box. A subsequent search of the box revealed that it contained seven kilogram-sized packages of suspected cocaine in addition to five smaller bags of fractional kilogram amounts of suspected cocaine.

35.     Inside the residence, law enforcement located and seized numerous kilogram wrappers and plastic packaging materials. Additionally, law enforcement located and seized a loaded Glock .45 caliber handgun from behind a dresser in the bedroom N.E. claimed as hers.

36.     Based on the forgoing information, I believe there is probable cause to believe that Yaciel MARAGOTO and Juan Carlos CRUZ PAZ committed the offense of conspiracy to possess

with intent to distribute more than 500 grams of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

Thomas Adam Ballew, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me in West Palm Beach, Florida this ____ day of February 2020.

Dave Lee Brannon
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

CASE NO.   20-8081-DLB

Defendant's Name: YACIEL MARAGOTO

| COUNT | VIOLATION | U.S. CODE | MAX. PENALTY |
|-------|-----------|-----------|--------------|
| 1 | Conspiracy to possess with intent to distribute 500 grams or more of cocaine | 21:841(a)(1) 21:846 | 5 year minimum mandatory up to 40 years in prison SR: 4 years up to life $4 million fine $100 special assessment |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

<u>PENALTY SHEET</u>

CASE NO.   <u>20-8081-DLB</u>

Defendant's Name: <u>JUAN CARLOS CRUZ PAZ</u>

| COUNT | VIOLATION | U.S. CODE | MAX. PENALTY |
|-------|-----------|-----------|--------------|
| 1 | Conspiracy to possess with intent to distribute 500 grams or more of cocaine | 21:841(a)(1)<br>21:846 | 5 year minimum mandatory up to 40 years in prison<br>SR: 4 years up to life<br>$4 million fine<br>$100 special assessment |

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _20-8081-DLB_____

UNITED STATES OF AMERICA

v.

**YACIEL MARAGOTO and**
**JUAN CARLOS CRUZ PAZ,**

Defendants.
_____/

### CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States
   Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?        ___ Yes  ✔ No

2. Did this matter originate from a matter pending in the Northern Region of the United States
   Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  ___ Yes  ✔ No


Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _____

RINKU TRIBUIANI
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No.    0150990
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:       (561) 820-8711
Fax:      (561) 820-8777
Email:   Rinku.Tribuiani@usdoj.gov